COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Callins and Senior Judge Clements
Argued at Richmond, Virginia


GROVER GARNELL GORDON, JR.
                                                      MEMORANDUM OPINION* BY
v.        Record No. 0126-23-2                     JUDGE DOMINIQUE A. CALLINS
                                                           JULY 30, 2024
COMMONWEALTH OF VIRGINIA


                      FROM THE CIRCUIT COURT OF HANOVER COUNTY
                                   Patricia Kelly, Judge

                David B. Hargett (Carl Muzi; Hargett Law, PLC, on brief), for
                appellant.

                Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
                Attorney General, on brief), for appellee.


       Following a jury trial, the trial court convicted Grover Garnell Gordon, Jr., of attempted

murder, using a firearm in the commission of a felony, aggravated malicious wounding, and

discharging a firearm from a motor vehicle.  The trial court sentenced Gordon to a total of 23 years

and 12 months of imprisonment and suspended 18 years and 12 months.  Challenging the

sufficiency of the evidence to sustain his convictions, Gordon appeals, arguing that he acted in

self-defense and without malice.  Finding no error, we affirm the judgment of the trial court.

       * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

In 2021, Gary Dalton was friends with Antoine Cheatham. Dalton occasionally gave Cheatham a ride when he needed it, in return for which Cheatham, who was a drug dealer, would give Dalton Xanax pills. On several occasions, Dalton drove Cheatham to collect money from people who owed him. Dalton did not carry any weapons when he took Cheatham to collect these debts, nor did he ever see Cheatham with a weapon. Dalton also never threatened violence or behaved aggressively when he went with Cheatham to collect money.

At about 6:00 p.m. on December 28, 2021, Cheatham called and asked Dalton to drive him to a Wawa convenience store in Ashland. Dalton agreed and drove to the address that Cheatham provided. When Cheatham entered the car, he told Dalton that he needed to meet a man who owed him $140. Before they had traveled 200 yards, however, Cheatham saw a car turning into the neighborhood and commented, "there he goes right there." Cheatham instructed Dalton to make a u-turn, and Dalton proceeded to follow the other car, even as it turned around in a cul-de-sac. Dalton then stopped on the right side of the road behind the other car, which was near the residence where Cheatham had been earlier. Cheatham exited the car and told Dalton to "come on," so Dalton followed Cheatham to the other stopped vehicle. Dalton testified there was "[n]othing unusual" about what had, up to that point, occurred that evening, explaining that he and Cheatham had "done it several times."

Dalton arrived at the driver's window of the other car first; he placed both of his hands on the side mirror as to allow the driver, Gordon, to see that Dalton did not "have anything in [his]

---

[1] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). In doing so, we discard any of Gordon's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473 (quoting *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)).

hands." The window of the car door was down, and Gordon, whom Dalton did not know, was in the driver's seat. As he approached Gordon's car, Cheatham asked, "[Y]o, man, you got my hundred and forty dollars[?]" Then, Dalton heard Cheatham say "gun, gun." Dalton turned to run, but heard Gordon fire two shots in quick succession, striking Dalton once in the back. Dalton fell to the ground.

A neighborhood resident's surveillance camera recorded Gordon's car stopping on the street and Dalton pulling in behind it. The video shows Dalton and Cheatham immediately exiting the car; seconds after the two figures reach Gordon's car, Dalton falls to the ground. Eventually, Gordon moves his car forward and turns off its lights. The video shows Gordon going inside a nearby trailer and returning outside to the scene of the shooting, where he remains until police arrive.

The police found a gun on the hood of Gordon's car and recovered a cartridge casing outside of Gordon's car and a second cartridge casing in the car's back seat. Both cartridge casings had been fired from Gordon's gun. The police also arrested Cheatham on the scene; he possessed no weapons. Gordon told police that he did not see any weapons before the shooting and he had not seen Cheatham with a weapon before. Gordon made no claim that Cheatham and Dalton attempted to rob him,[2] but he did convey to police that he "feared for his safety."

The bullet that struck Dalton traveled through his body, damaged both lungs, and lodged in his shoulder. His ankle fractured when he fell to the ground. Dalton was hospitalized for two weeks after the shooting. At the time of Gordon's trial, Dalton's breathing remained diminished as a result of the shooting and his ankle had not healed correctly.[3]

---

[2] Gordon did, however, state to police that Cheatham had "brought a friend to try and rob me," and the 911 call that "came in" reflected that Gordon "thought he was being robbed."

[3] Dalton had no contact with Cheatham after the shooting, and Cheatham did not testify at trial.

Testifying in his own behalf, Gordon said that earlier in the evening before the incident, Cheatham had been at his girlfriend's home and was "beefing" about there being a "snitch somewhere around the neighborhood." Cheatham repeated the statement three or four times, each time focusing his gaze on Gordon. Gordon claimed that the police had approached him to be a confidential informant, and he feared that Cheatham knew about this. Thinking "it best for [him] to separate [him]self and remove [him]self out of the residence," Gordon left to inflate a car tire at Wawa and wait for Cheatham to leave his girlfriend's home. While Gordon was at Wawa, Cheatham called Gordon, and Gordon invited Cheatham to come to Wawa to talk. Gordon acknowledged that he did not feel threatened by Cheatham when he called.

After waiting at Wawa for a while, Gordon started driving back to his girlfriend's home, "thinking that . . . the coast was clear and everything was good and [that he] could continue plans for dinner." As Gordon turned into the neighborhood, he noticed a car following him but was not concerned about it, thinking, "maybe it's a pizza delivery person or something looking for an address." Proceeding into a cul-de-sac, Gordon saw "the car still trailing [him]." As Gordon exited the cul-de-sac and drove past the other vehicle, he "had no concern."

Gordon testified that after he parked at his girlfriend's home, the "vehicle behind [him] accelerated right up to the rear of [his] car." Gordon set his keys down and "heard them fall." Gordon could "only . . . notice silhouettes" and "couldn't find [his] key to try to get away." As the trailing car's occupants quickly approached his door, he could hear "metal on metal beside [his] car." Soon, Dalton was "crowd[ing] [Gordon's] door," preventing him from "open[ing] [the] door to be able to escape." According to Gordon, he recognized Cheatham's voice saying that he was "going to gut [him] and kill [him]." Dalton said nothing.

With Dalton in front of his car door, and Cheatham to its rear, Gordon reached for his car keys, felt his gun on the floorboard beneath his seat, and pulled out the gun. He "came up

- 4 -

shooting." Gordon testified that he fired the gun because he "feared for [his] life" and thought he was going to be killed and that he "shot to shoot [Cheatham] because [he] . . . couldn't see him." Gordon further testified that, after missing Cheatham, he "popped" Dalton after Dalton had been "cramping [his] door and . . . just [as he] started backing up when [Dalton] heard that shot." Gordon "thought [he] was getting ready to be robbed." Gordon denied that he owed Cheatham any money. Gordon admitted that he did not know whether Cheatham or Dalton had a gun and "didn't see one."

The trial court instructed the jury on principles relating to justifiable self-defense, malice, and heat of passion. The jury convicted Gordon of the charged offenses, and the trial court subsequently refused to set aside the verdict on grounds that he acted in self-defense and without malice. Gordon appeals.

## ANALYSIS

### I. Standard of Review

"When reviewing the sufficiency of the evidence, we presume the judgment of the trial court is correct and we will not disturb it unless it is plainly wrong or without evidence to support it." *Taylor v. Commonwealth*, 77 Va. App. 149, 170 (2023). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Washington v. Commonwealth*, 75 Va. App. 606, 615 (2022) (alteration in original) (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020)). "The only question is whether *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Taylor*, 77 Va. App. at 170 (emphasis added). Thus, "[i]f there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Washington*, 75 Va. App. at 615 (quoting *McGowan*, 72 Va. App. at 521).

A jury, as factfinder, has the "right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true." *Lynn v. Commonwealth*, 27 Va. App. 336, 354 (1998) (quoting *Painter v. Commonwealth*, 210 Va. 360, 367 (1969)), *aff'd*, 257 Va. 239 (1999). "[T]hey [also] have broad discretion in applying the law to the facts and in fixing the degree of guilt, if any, of a person charged with a crime." *Id.* (quoting *Painter*, 210 Va. at 367).

## II. Gordon's Self-Defense and Malice Arguments

A. *The jury, as factfinder, could find that Gordon failed to prove circumstances of self-defense sufficient to create a reasonable doubt of his guilt.*[4]

The gravamen of Gordon's argument is this: because Cheatham and Dalton "acted in an aggressive and confrontational fashion involving the threatened use of force or imminent physical harm," Gordon justifiably defended himself against such acts, "reasonably fear[ing] for his life." Gordon concludes that his use of deadly force was justified primarily on the basis of his own testimony, from which he claims to sift out "specific overt acts of aggression by Cheatham and Dalton" that warranted such use of force. Gordon, on brief, knits these "acts" together to form a dramatic narrative—focusing on how Cheatham and Dalton followed and then quickly parked behind Gordon, approached him, headlights "glar[ing]," all while it was dark outside and Cheatham leveled threats to kill Gordon and "goug[ed] his car with a metal object." These events, Gordon impresses, sparked a "chain reaction of aggressive and threatened use of harm." It was in response to, or as part of this chain reaction, Gordon asserts, that he "used his

---

[4] Gordon's first assignment of error asserts that the trial "court erred in failing to acquit Gordon . . . ." Because Gordon was found guilty by a *jury*, the assignment seems to assign error to that body, rather than the trial court, for failing to acquit Gordon. *See Barnes v. Commonwealth*, 80 Va. App. 588, 595 (2024) ("[F]or an assignment of error to comply with Rule 5A:20(c)(2) and Rule 5A:18, it must identify an erroneous ruling, finding, or failure to rule *by the trial court*."). When asked at oral argument whether he intended to assign error to the jury, Gordon's counsel clarified his intention to address the trial court's failure to grant Gordon's motion to set aside the jury verdicts.

firearm to protect himself, as [a] last resort" and "attempted to take necessary steps to retreat and avoid any potential confrontation with Cheatham and Dalton."

"The law in this area is clear. A defendant bears the burden of introducing evidence supporting the affirmative defense of self-defense." *Washington*, 75 Va. App. at 617. "To meet this burden, the defendant at trial must 'prove[] circumstances' of self-defense sufficient to 'create a reasonable doubt' of his guilt." *Id.* (alteration in original) (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)). "'Whether an accused' meets this threshold 'is a question of fact.'" *Id.* (quoting *Smith*, 17 Va. App. at 71).

"In order to establish self-defense, a defendant must show that he . . . 'reasonably believed that [he] was in danger of serious bodily harm or death.'" *Id.* (alterations in original) (quoting *Jones v. Commonwealth*, 71 Va. App. 70, 86 (2019)). "In addition, he must demonstrate 'that he was in imminent danger of harm' by showing 'an overt act or other circumstance' that constitute[d] 'an immediate threat to safety.'" *Id.* (quoting *Jones*, 71 Va. App. at 86).

But "[t]he bare fear that a man intends to commit murder, however well grounded, unaccompanied by any overt act indicative of such an intention, will not warrant killing the party by way of prevention." *Harper v. Commonwealth*, 196 Va. 723, 731 (1955) (quoting *Mercer v. Commonwealth*, 150 Va. 588, 597 (1928)). Such an overt act must be "indicative of imminent danger at the time." *Commonwealth v. Sands*, 262 Va. 724, 729 (2001) (quoting *Vlastaris v. Commonwealth*, 164 Va. 647, 652 (1935)). That is, "a defendant 'must wait till some overt act is done[,] . . . till the danger becomes imminent.'" *Id.* (alterations in original) (quoting *Vlastaris*, 164 Va. at 652). "In the context of a self-defense plea, 'imminent danger' is defined as 'an immediate, real threat to one's safety[.]'" *Id.* (quoting *Black's Law Dictionary* 399 (7th ed. 1999)). In other words, "[t]here must be . . . some act menacing present peril . . . [and] the

act . . . must be of such a character as to afford a reasonable ground for believing there is a design . . . to do some serious bodily harm, and imminent danger of carrying such design into immediate execution." *Id.* (all but first alteration in original) (quoting *Byrd v. Commonwealth*, 89 Va. 536, 539 (1893)). Further, imminence of harm is not a fixed or static state. That "a person may represent an imminent harm and immediate threat at one point in a confrontation does not require the conclusion that he or she retains that status throughout an encounter." *Meade v. Commonwealth*, 74 Va. App. 796, 808 (2022).

While "the trier of fact [i]s free to consider [the evidence] and give it the weight [they] th[ink] appropriate," *Johnson v. Commonwealth*, 70 Va. App. 45, 50 (2019), "whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted," *Lienau v. Commonwealth*, 69 Va. App. 254, 265 (2018) (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)), *aff'd*, 69 Va. App. 780 (2019) (en banc).

In considering the evidence and assigning weight to it, the jury could have found that Gordon failed to prove circumstances of self-defense sufficient to create a reasonable doubt. Gordon testified that he saw neither Cheatham nor Dalton carrying a weapon. Nor did he even testify that Dalton reached for his waistband in a manner as to suggest that he was armed. *See Jones*, 71 Va. App. at 95 ("[T]he mere act of reaching toward a waistband even when coupled with the speculative fear that the reach may be for a weapon, is not sufficient as a matter of law to constitute an overt act that justifies the preemptive use of deadly force."). Instead, Gordon testified, Dalton began to "back[] up" after hearing the first shot. *See Meade*, 74 Va. App. at 808. Further, because Gordon could not see Cheatham, his testimony indicates that he shot blindly in Cheatham's direction when he opened fire.

That the danger was sufficiently imminent to justify the use of deadly force is also in tension with Gordon's testimony that he initially looked for his keys, and when he, instead,

found a gun, he "came up shooting." In other words, Gordon's testimony evinced that he did not, in the first instance, find the danger sufficient to immediately reach for his gun; rather, he sought his keys, and unable to locate them, then found a gun, which he deployed.

But the jury need not have confined itself to Gordon's testimony in determining whether Gordon "'was in imminent danger of harm' . . . constitut[ing] 'an immediate threat to safety.'" *Washington*, 75 Va. App. at 617 (quoting *Jones*, 71 Va. App. at 86). Indeed, the jury, as factfinder, was under no obligation to treat Gordon's testimony as an evidentiary lodestar and could disbelieve Gordon's testimony as self-serving subterfuge. *See id.* at 616 ("[I]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011))). *Cf. Lienau*, 69 Va. App. at 268 ("[I]t was for the jury to determine how the events reasonably appeared to [Gordon][.]").

Dalton's testimony provided the jury with a different, and in some respects, contradictory, image of what occurred before the moment when Gordon "came up shooting." In particular, there was sharp divergence between Gordon's and Dalton's testimony on the issue of what Cheatham stated as he approached Gordon's car. Whereas Gordon testified that Cheatham issued threats on Gordon's life, Dalton testified that Cheatham queried about money that Gordon owed to Cheatham, asking, "[Y]o, man, you got my hundred and forty dollars[?]" Dalton also testified that he placed his hands on the sideview mirror of Gordon's car, expressly as to show Gordon that he did not "have anything in [his] hands." Moreover, Dalton testified that he was not simply backing up, but rather, *turning to run* as Gordon shot him. This account of Dalton's actions immediately preceding the shooting fit with Dalton's description of how the bullet entered and traveled through his body. Dalton testified,

> And that's when I turned to run. I didn't fall until he shot me.
> That's when I fell and . . . fractured my left ankle[;] . . . the bullet

went in my back, went through this lung. Then it travelled this way (indicating), went through the other lung and lodged in my shoulder up here and they cut me all [the] way down here.

In sum, Dalton provided no testimony establishing an overt act that could have operated to justify Gordon's decision to abruptly "come up shooting" almost immediately after Dalton and Cheatham reached Gordon's vehicle. *See Sands*, 262 at 729 ("[A] defendant 'must wait till some overt act is *done*[,] . . . till the danger becomes imminent.'" (second and third alterations in original) (emphasis added) (quoting *Vlastaris*, 164 Va. at 652)).

When the jury weighed this and the other evidence, it could find, and found, that the evidence Gordon adduced was insufficient "[t]o meet [his] burden" of "'prov[ing] circumstances' of self-defense sufficient to 'create a reasonable doubt' of his guilt." *Washington*, 75 Va. App. at 617 (quoting *Smith*, 17 Va. App. at 71). *See Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016) ("Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." (quoting *Smith*, 17 Va. App. at 71)). Accordingly, because the jury, as factfinder, could conclude that Gordon did not fire his gun in self-defense, the trial court did not err in refusing to set aside the verdict on that ground.[5] *See Taylor*, 77 Va. App. at 170 ("When reviewing the sufficiency of the evidence, we . . . will not disturb [the judgment of the trial court] unless it is plainly wrong or without evidence to support it.").

B. *Because Gordon did not prove circumstances of self-defense sufficient to create a reasonable doubt of his guilt, his malice argument lacks merit.*

Gordon also argues that because "[t]he charges of attempted murder and aggravated malicious wounding require malice," "[i]f the attempted murder charge falls, so does the use of

---

[5] Because the jury could find that no evidence established an overt act justifying Gordon's opening fire from his vehicle, it could further find that the force Gordon employed was, perforce, "[dis]proportiona[te] to the threat posed." *Peeples v. Commonwealth*, 30 Va. App. 626, 635 (1999) (en banc).

- 10 -

the firearm charge."[6] He contends that "[v]iewed in the light most favorable to the Commonwealth, the evidence clearly showed that [he] intended to shoot both Cheatham and Dalton, but there is no evidence that demonstrates malice[.]" Because Gordon failed to prove the circumstances of self-defense, this argument lacks merit and also fails.[7]

Malice entails "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Meade*, 74 Va. App. at 813 (quoting *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019)). In finding Gordon's affirmative defense unavailing, the jury presumably "inferred [malice] from [Gordon's] deliberate use of a deadly weapon." *Luck v. Commonwealth*, 32 Va. App. 827, 834 (2000).

Accordingly, the jury could have found that, when Gordon "came up shooting," he acted with malice, having undertaken a "wrongful act intentionally, or without just cause or excuse." *Meade*, 74 Va. App. at 813 (quoting *Watson-Scott*, 298 Va. at 256).[8]

---

[6] Gordon further contends that "the charge for shooting from [a] vehicle" should "not stand if [he] is entitled to an acquittal based on justifiable self defense." This argument, like the others Gordon raises, lacks merit since Gordon failed to prove the circumstances of self-defense.

[7] At oral argument, Gordon's counsel acknowledged that Gordon's two assignments of error present the "same argument, just divided in two little sections."

[8] Gordon also claims, without explanation, citation to legal authority, or further exposition, that the evidence did not prove he possessed "the necessary criminal intent." "[I]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Sneed v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)). "Nor is it this Court's 'function to comb through the record . . . in order to ferret-out for ourselves the validity of [appellant's] claims.'" *Burke v. Catawba Hosp.*, 59 Va. App. 828, 838 (2012) (alterations in original) (quoting *Fitzgerald v. Bass*, 6 Va. App. 38, 56 n.7 (1988) (en banc)). Consequently, we do not consider Gordon's assertion that the evidence did not prove he possessed the necessary criminal intent.

Gordon additionally appears to argue that because "[t]he trial court ruled that [he] was not at fault for bringing on the confrontation," he "ha[d] the right to use lethal force to defend." This argument is meritless. "'Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault,' referred to as justifiable self-defense, and 'self-defense with fault,' known as excusable self-defense." *Washington*, 75 Va. App. at 617 (quoting *Bell*, 66 Va. App. at 487). "The first type occurs when the accused is 'without any fault on his part in provoking or bringing on the difficulty.'" *Id.* (emphasis omitted) (quoting *Avent v.*

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

*Commonwealth*, 279 Va. 175, 199 (2010)).  Here, the jury was provided instructions on this first type of self-defense.  But, in so instructing the jury, the trial court did not find that Gordon had the right to use lethal force to defend himself.  As established, *supra*, the jury could find that Gordon failed to prove circumstances of self-defense.  *See id.*